FILED

JAN 1 1 2001

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    TY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ANDREW H.K. WONG,

        Plaintiff,

  v.

REGENTS OF THE UNIVERSITY
OF CALIFORNIA,

        Defendant.

_____/

NO. CIV. S-96-965 LKK/GGH

O R D E R

    Plaintiff, Andrew Wong, was a student at the University of California at Davis, School of Medicine ("UCD SOM"). He alleges that the University discriminated against him on the basis of his learning disability, in violation of the Americans with Disabilities Act ("ADA"). This case is now before the court on defendant's motion for summary judgment. I resolve this motion based on the pleadings and evidence filed herein and after oral argument.

////

////

1

1

**I.**

2

**FACTS[1]**

3

**A.  A HISTORY OF PLAINTIFF'S IMPAIRMENT**

4    Plaintiff's entire academic history has been filled with
5  contradictions.  In kindergarten, plaintiff was identified as
6  suffering from a learning impairment, but in grammar school he was
7  certified as a gifted student.  At approximately the age of ten,
8  plaintiff received remediation from a speech and language
9  specialist, and in middle school, he was assigned to a special
10  class for assisted learning.  While attending high school, junior
11  college and at San Francisco State University, plaintiff regularly
12  requested extra time on assignments and essay examinations.  After
13  attaining his degree, plaintiff took courses in speech and
14  interpersonal communications because he believed that he was weak
15  in these areas.

16  **B.  MR. WONG'S ACADEMIC SUCCESS**

17    Whatever the significance of plaintiff's history, it has not
18  generally limited his academic achievements through his first two
19  years of medical school.  In 1981, Mr. Wong graduated from San
20  Francisco State, magna cum laude, earning a B.S. in Biochemistry
21  with a cumulative grade point average of 3.54 out of 4.0.  He went
22  on to earn a Master's Degree in Cellular/Molecular Biology from the
23  California State University at San Francisco in 1984.

24  ////

25

26    [1] Except as otherwise noted, this section recites the
undisputed facts demonstrated by the record.

2

1    Plaintiff was accepted for the 1989 fall term at UCD SOM under
2  no special admission provisions.  He completed his first two years
3  of school on a normal schedule, earning 8 C's, 19 B's and 11 A's,
4  and passed his National Board of Medical Examiners' Examination
5  without any special accommodation.   Plaintiff did not identify
6  himself to the medical school as "learning disabled" or in need of
7  accommodations at any time before he encountered academic
8  difficulty during his third year.

9  **C.   MR. WONG'S THIRD YEAR IN MEDICAL SCHOOL**

10    In June of 1991, Mr. Wong enrolled in the Surgery Clerkship,
11  which is one of the "core" clerkships which must be completed
12  during the third year of the medical school curriculum.  He failed
13  this clerkship.  The Promotions Board, which monitors students with
14  academic deficiencies, recommended that he be required to repeat
15  the Surgery Clerkship and be placed on probation.

16    When  Mr. Wong's father became ill, plaintiff withdrew from
17  his Medicine Clerkship and was granted time off.   Plaintiff
18  returned to medical school in June of 1992, completing his
19  Psychiatry Clerkship with a grade of "B."  He also passed his
20  Pediatric Clerkship with a C+ in the Summer/Fall Quarter of 1992,
21  but his instructor noted his "limited abilit[y] to effectively
22  communicate his thoughts."  He then proceeded with the
23  Obstetrics/Gynecology ("OB/GYN") Clerkship, receiving a grade of
24  "C", with evaluators noting his analytical skills as poor to fair,
25  his case management skills as fair, and his foundation of knowledge
26

3

1 | as poor to good.[2]

2 || In January of 1993, Mr. Wong began his second attempt to
3 | complete the Medicine Clerkship. Because his father died during
4 | this course, plaintiff was allowed to again withdraw and to
5 | postpone further core clerkships until his family situation had
6 | settled. He was then allowed to take a series of fourth-year
7 | elective courses at hospitals in the San Francisco area so that he
8 | could be near his family. He passed all three of these courses.

9 || During the Summer Quarter of 1993, Mr. Wong enrolled in the
10 | Medicine Clerkship for the third time. He failed this course.
11 | As a result of his failure, he was again called before the Student
12 | Evaluations Subcommittee ("SEC") regarding his academic standing.
13 | On November 8, 1993, the Promotions Board ruled that Mr. Wong must
14 | withdraw from his current clerkship.

15 || To remain in the medical program, the Promotions Board
16 | required plaintiff to seek a psychiatric evaluation for depression,
17 | with a follow-up at the medical school's Counseling Center. He was

18 |

19 || [2] Plaintiff objects to the above facts as irrelevant to
20 | defendant's motion for summary judgment on the grounds that the
issue of whether or not plaintiff is "otherwise qualified" to
21 | continue his studies at UCD SOM is not before the court. I cannot
agree. For plaintiff to establish a prima facie case he must
22 | tender evidence that he is disabled within the meaning of the ADA,
see Sutton v. United Air Lines, Inc., 119 S.Ct. 2139 (1999), i.e.
23 | plaintiff must produce evidence that he suffers from a physical or
mental impairment that substantially limits one or more of his
24 | major life activities. See id. at 2144. As examined in detail in
the opinion, plaintiff contends that he is substantially limited
25 | in the major life activities of learning, reading and working. The
objected to evidence addresses his ability to learn and
26 | inferentially to read, and therefore is relevant to defendant's
motion.

4

1  also required to complete at least three quarters of the reading
2  electives and to return to the SEC for reevaluation regarding his
3  academic standing after the Winter Quarter of 1994.  Finally, he
4  was required to repeat his third year in its entirety.

5  **D.  DIAGNOSIS OF MR. WONG'S LEARNING DISABILITY**

6  In December of 1993, Dr. Emil Rodolpha of the University's
7  Counseling Center, undertook a psychiatric evaluation of Mr. Wong.
8  Dr. Rodolpha reported that Mr. Wong described himself as a "slow
9  learner" who has difficulty concentrating, focusing his attention,
10 comprehending, and remembering.

11  Dr. Cherise Northcutt, a licensed learning disabilities
12 examiner, tested Mr. Wong and concluded that he had a learning
13 disability.  She described this disability as a difficulty in
14 comprehending and processing verbal and linguistic information that
15 is presented at a rapid rate.  Dr. Northcutt further concluded that
16 Mr. Wong had "significant deficits in the area of reading rate and
17 comprehension."

18  In early 1994, the medical school arranged for Margaret
19 Steward, Ph.D., a psychologist and faculty member, to work with the
20 plaintiff regarding accommodations for his learning impairment in
21 preparation for the repetition of his third year courses.  Dr.
22 Steward counseled Mr. Wong and suggested several coping strategies.
23 She informed plaintiff that UCD SOM would set up a Disability
24 Resource Team to assist him in determining what accommodations were
25 available to him, and in advocating for such accommodations on his
26 behalf.

5

1 **E.     MR. WONG'S ACADEMIC PERFORMANCE AFTER DIAGNOSIS**

2       Plaintiff was allowed to commence the Medicine Clerkship for
3 the fourth time in July of 1994.  After attending an orientation
4 session for the course, however, he became concerned regarding his
5 readiness and requested an additional eight weeks off to prepare
6 for his return to medical school.  Dr. Lewis, Associate Dean for
7 Student Affairs, approved this request, and plaintiff received
8 additional time on the examination in the Medicine Clerkship.  He
9 passed the Medicine Clerkship with a "B" and received general
10 praise, except for concerns expressed about his oral presentations.

11      Mr. Wong was also allowed to take an additional eight weeks
12 off before proceeding to his Surgery Clerkship,  which commenced
13 in January of 1995, and was granted additional time on the Surgery
14 Clerkship examinations.   He received a "B" in that clerkship.

15      Before beginning the Winter/Spring Quarter of 1995, Mr. Wong
16 requested additional time off to prepare for his Pediatrics
17 Clerkship. He had previously completed this clerkship successfully
18 without accommodation. Dr. Lewis denied Mr. Wong's request as
19 unreasonable, unfair to other students and contrary to the purposes
20 of the curriculum.  Plaintiff was allowed additional time on both
21 the oral and written examinations, which he passed.  Nonetheless,
22 Mr. Wong failed the Pediatrics Clerkship because his performance
23 with patients in a clinical setting was judged to be
24 unsatisfactory.  Many evaluators were concerned as to whether Mr.
25 ////
26 ////

6

1   Wong "could safely practice clinical medicine."[3]

2   **F.   MR. WONG'S DISMISSAL FROM MEDICAL SCHOOL.**

3       In May of 1995, while plaintiff was repeating the OB/GYN
4   Clerkship as required, he was again called before the SEC.
5   Preliminary evaluations were not favorable and there was concern
6   as to whether plaintiff would complete the OB/GYN Clerkship
7   successfully.  After a discussion and consideration of plaintiff's
8   entire medical school academic record, and a consideration of
9   mitigating factors including the diagnosis of a learning
10  disability, the SEC recommended that he be dismissed.

11      The University contends that Mr. Wong's dismissal was based
12  on a consensus that, even with accommodations, he was not likely
13  to become a competent physician and could not attain and
14  consistently demonstrate the level of skill necessary to practice
15  clinical medicine autonomously.   On May 17, 1995, Mr. Wong was
16  dismissed from the medical school.

17                               **II.**

18                    **SUMMARY JUDGMENT STANDARDS**

19      Summary judgment is appropriate when it is demonstrated that
20  there exists no genuine issue as to any material fact, and that the
21  moving party is entitled to judgment as a matter of law.  Fed. R.
22  Civ. P. 56(c); See also Adickes v. S.H. Kress & Co., 398 U.S. 144,
23  157 (1970); Owen v. Local No. 169, 971 F.2d 347,355(9th Cir. 1992).

24

25      [3]  Plaintiff's counsel does not dispute the preceding facts
    but finds them irrelevant.  Again, these facts address Mr. Wong's
    ability to learn and work, and therefore, are material and relevant
26  to defendant's motion for summary judgment.

                                  7

1    Under   summary   judgment   practice,   the   moving   party

2            [A]lways bears the initial responsibility of
             informing the district court of the basis for
3            its motion, and identifying those portions of
             "the  pleadings,  depositions,  answers  to
4            interrogatories,  and  admissions  on  file,
             together with the affidavits, if any," which
5            it  believes  demonstrate  the  absence  of  a
             genuine issue of material fact.
6

7    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the

8    nonmoving party will bear the burden of proof at trial on a

9    dispositive issue, a summary judgment motion may properly be made

10   in reliance solely on the 'pleadings, depositions, answers to

11   interrogatories, and admissions on file.'"  Id.  Indeed, summary

12   judgment should be entered, after adequate time for discovery and

13   upon motion, against a party who fails to make a showing sufficient

14   to establish the existence of an element essential to that party's

15   case, and on which that party will bear the burden of proof at

16   trial.  Id. at 322.  "[A] complete failure of proof concerning an

17   essential element of the nonmoving party's case necessarily renders

18   all other facts immaterial."  Id.  In such a circumstance, summary

19   judgment should be granted, "so long as whatever is before the

20   district court demonstrates that the standard for entry of summary

21   judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

22       If the moving party meets its initial responsibility, the

23   burden then shifts to the opposing party to establish that a

24   genuine issue as to any material fact actually does exist.

25   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

26   586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,

1  391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607
2  F.2d 1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).
3      In attempting to establish the existence of this factual
4  dispute, the opposing party may not rely upon the denials of its
5  pleadings, but is required to tender evidence of specific facts in
6  the form of affidavits, and/or admissible discovery material, in
7  support of its contention that the dispute exists.  Rule 56(e);
8  Matsushita, 475 U.S. at 586 n.11; See also First Nat'l Bank, 391
9  U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).
10  The opposing party must demonstrate that the fact in contention is
11  material, i.e., a fact that might affect the outcome of the suit
12  under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.
13  242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec.
14  Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the
15  dispute is genuine, i.e., the evidence is such that a reasonable
16  jury could return a verdict for the nonmoving party, Anderson, 477
17  U.S. 248-49; See also Wool v. Tandem Computers, Inc., 818 F.2d
18  1433, 1436 (9th Cir. 1987).
19      In the endeavor to establish the existence of a factual
20  dispute, the opposing party need not establish a material issue of
21  fact conclusively in its favor.  It is sufficient that "the claimed
22  factual dispute be shown to require a jury or judge to resolve the
23  parties' differing versions of the truth at trial."  First Nat'l
24  Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631.
25  Thus, the "purpose of summary judgment is to 'pierce the pleadings
26  and to assess the proof in order to see whether there is a genuine

9

1   need for trial.'"   Matsushita, 475 U.S. at 587 (quoting Fed. R.
2   Civ. P. 56(e) advisory committee's note on 1963 amendments); See
3   also International Union of Bricklayers & Allied Craftsman Local
4   Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir.
5   1985).

6        In resolving the summary judgment motion, the court examines
7   the pleadings, depositions, answers to interrogatories, and
8   admissions on file, together with the affidavits, if any.   Rule
9   56(c); See also SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th
10  Cir. 1982).  The evidence of the opposing party is to be believed,
11  Anderson, 477 U.S. at 255, and all reasonable inferences that may
12  be drawn from the facts placed before the court must be drawn in
13  favor of the opposing party, Matsushita, 475 U.S. at 587 (citing
14  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per
15  curiam)); See also Abramson v. University of Hawaii, 594 F.2d 202,
16  208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out
17  of the air, and it is the opposing party's obligation to produce
18  a factual predicate from which the inference may be drawn.   See
19  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D.
20  Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

21       Finally, to demonstrate a genuine issue, the opposing party
22  "must do more than simply show that there is some metaphysical
23  doubt as to the material facts. . . . Where the record taken as a
24  whole could not lead a rational trier of fact to find for the
25  nonmoving party, there is no 'genuine issue for trial.'"
26  Matsushita, 475 U.S. at 587 (citation omitted).

1

## III.

2

### SUPPLEMENTAL DISCLOSURE OF EXPERT WITNESSES

3       On March 15, 2000, the court issued an order closing discovery
4   on August 13, 2000. See Status Conference Order, at 3 ¶ 23.   The
5   order provides that all counsel are "to inform the court and all
6   other parties of the names of all experts that they propose to
7   tender at trial not later than forty-five (45) days before the
8   close of discovery."   See id., at 4 ¶¶ 5-9.   The order further
9   requires that "all experts are to be fully prepared to render an
10  informed opinion at the time of designation so that they may fully
11  participate in any deposition taken by the opposing party."   See
12  id., at 4. ¶¶ 12-14.   Finally, the order provides that the only
13  grounds permitting the testimony of an undisclosed expert witness
14  is if (a) the necessity of the witness could not have been
15  reasonably anticipated at the time the lists were exchanged; (b)
16  the court and opposing counsel were promptly notified upon
17  discovery of the witness; and (c) that the witness was promptly
18  proffered for deposition.   See id., at 4 ¶¶ 17-21.

19      On September 20, 2000, plaintiff filed a supplemental expert
20  witness list which included Dr. Bianca Hirsch, an expert in
21  learning disabilities, and Thomas Yankowski, a vocational
22  counselor.   Plaintiff contends that he could not have reasonably
23  anticipated the necessity of the testimony of these witnesses at
24  the time that expert witness disclosures were required to be made.
25  See Plaintiff's Supplemental Disclosure of Expert Witnesses, at 1
26  ¶¶ 20-22.   I cannot agree.

11

1    Plaintiff's position that he could not have reasonably
2  anticipated the necessity for including these new witnesses is
3  premised on his not reasonably anticipating that his status as
4  disabled was in contention.   There is no basis for such an
5  assertion.

6    In a previous order, the court noted defendant's reservation
7  of its right to dispute plaintiff's contention that he is an
8  individual with a disability as defined by the ADA.   See Order
9  dated April 3, 1998, at 9 n. 4.   That order gave plaintiff ample
10  notice, if it was needed, that disability status was a potential
11  issue.   Even without the court's previous order, the plaintiff was
12  on notice that Mr. Wong's status was at issue.

13    A Status Report filed by defendant requested further discovery
14  predicated upon the recent United States Supreme Court cases
15  addressing the contours of disability under the ADA.   See
16  Defendant's Status Report at 2 ¶¶ 14-15. A cursory examination of
17  those cases should have placed plaintiff on notice that the defense
18  would challenge whether Mr. Wong was in fact disabled.

19    It is plaintiff's burden to establish a prima facie case that
20  he is disabled with the meaning of the ADA.   See Thompson v. Holy
21  Family Hospital, 121 F.3d 537, 539 (9th Cir. 1997).   The fact that
22  defense counsel would challenge plaintiff's assertion that Mr. Wong
23  is in fact disabled was to be expected.   Indeed, if plaintiff was
24  in doubt he could have resolved the issue with contention
25  interrogatories; he did not do so.   No reasonable argument has been
26  tendered by plaintiff for failing to comply with the court's Status

12

1 | Conference Order.

2 | For the above reasons, plaintiff's request to add Dr. Hirsch
3 | and Dr. Yankowski is denied. Accordingly, the court will not
4 | consider any evidence from these witnesses, and in regards to Dr.
5 | Kay Runyan, the court will only examine her opinions which do not
6 | rely upon the testing conducted by Dr. Hirsch.

7 |                                  **IV.**

8 |                     **DISABILITY UNDER THE ADA**

9 | As will become apparent, the term disability under the Act is
10 | one of art. Not every impairment suffered by an individual
11 | satisfies the statutory requirements of a disability. To explore
12 | this issue requires an examination of the statute, the implementing
13 | regulations, and the interpretive guidelines issued by various
14 | agencies. Below, I turn to that task.

15 | **A.   GOVERNING STATUTES, REGULATIONS AND GUIDELINES**

16 | As the parties indicate, plaintiff's allegations of
17 | discrimination by the Regents of the University of California
18 | derive from Title II of the ADA which governs public services and
19 | ////
20 | ////
21 | ////
22 | ////
23 | ////
24 | ////
25 | ////
26 | ////

13

1 | prohibits discrimination by public entities.[4]

2   The Supreme Court has noted that although Congress gave the
3 | EEOC authority to promulgate Title I regulations, See 42 U.S.C.
4 | § 12116, and the Department of Justice Title II regulations, See
5 | 42 U.S.C. § 12134, no agency was given the authority to issue
6 | regulations implementing the generally applicable provisions of the
7 | ADA falling outside Titles I-V.  See Sutton v. United Air Lines,
8 | Inc., 119 S. Ct. at 2145.  Accordingly, the High Court concluded
9 | that "no agency has been delegated authority to interpret the term
10 | "disability." Id.  Given the absence of congressional authority,
11 | the regulations and interpretive guidelines addressing the ADA's
12 | definition of disability are not binding on this court. Id.
13 | Because the Sutton Court did not address whether such regulations
14 | and guidelines, while not binding, are nevertheless entitled to
15 | deference, I must now address that issue.

16 | ////

17 | ////

18

19          [4]   42 U.S.C. § 12131 defines public entity as:

20          (A)   any State or local government;
            (B)   any department, agency, special purpose district,
       or other instrumentality of a State or States or local government;
21       and
            (C)   the National Railroad Passenger Corporation, and any
22       commuter authority (as defined in section 502(8) of Title 45).

23          42 U.S.C. § 12132 provides that:

24          Subject to the provisions of this subchapter, no qualified
       individual with a disability shall, by reason of such disability,
25       be excluded from participation in or be denied the benefits of the
       services, programs, or activities of a public entity, or be
26       subjected to discrimination by any such entity.

14

1     A court should consider adopting the position taken in
2  regulations and interpretive guidelines if the agency positions are
3  "wise and correct."  Davis, "Administrative Law Treatise, Vol. I,
4  239 (1994).  The weight to be accorded an agency interpretation in
5  a particular case will depend upon the "thoroughness evident in its
6  reasoning, its consistency with earlier and later pronouncements,
7  and all those factors which give it power to persuade, if lacking
8  power to control."  Skidmore v. Swift & Co., 323 U.S. 134, 140
9  (1944).   When, as here, Congress has not delegated specific
10 legislative authority to an agency, the federal courts are free to
11 reject the agency judgment and proceed without its guidance.  This
12 is the inevitable consequence of Article III reposing the judicial
13 power of the United States in its courts.  See Marbury v. Madison,
14 5 U.S. 137 (1803).  I now address the persuasiveness of the ADA
15 regulations and interpretive guidelines promulgated by the DOJ and
16 the EEOC.

17     Prior to Sutton, the Supreme Court had noted the bifurcated
18 responsibility for administering the ADA.  It observed, however,
19 that the "the well-reasoned views of the agencies implementing the
20 [ADA] constitute a body of experience and informed judgment to
21 which courts and litigants may properly resort for guidance."
22 Bragdon v. Abbott, 524 U.S. 624 (1998); see also Skidmore v. Swift
23 & Co., 323 U.S. at 139-140.  Thus, where the agencies' interpretive
24 guidelines are substantially similar, they are entitled to respect
25 and weight.  Where, however, the agencies are in disagreement, the
26 court must approach the problem with less deference.

**B.   DOES MR. WONG HAVE A DISABILITY UNDER THE ADA?**

The Americans with Disabilities Act prohibits discrimination by public entities against qualified individuals with a disability.[5] See 42 U.S.C. § 12131-12132. The Act defines a "disability" as: (a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment. See 42 U.S.C. § 12102.

To establish a prima facie case of disability discrimination against the University under the ADA or the Rehabilitation Act, plaintiff must establish that: (1) he is an individual with a disability, (2) who is otherwise qualified, and (3) who was denied participation in a program or activity receiving federal funds, (4) solely because of his disability. See Smith v. Barton, 914 F.2d 1330, 1338 (9th Cir. 1990); Murphy v. Franklin Pierce Law Center, 882 F. Supp. 1176, 1180-81 (D. N.H. 1994). The only issues remaining before this court is whether plaintiff has a physical or mental impairment that substantially limits one or more of his major life activities, or whether Mr. Wong was regarded as having such an impairment, and if either is so, whether that was the

---

[5]  The matter at issue is also addressed by the Rehabilitation Act which provides that: "[A] qualified individual with a disability shall not be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." See 29 U.S.C. § 794.   For purposes of defendant's motion, the analytical inquiries under each statute are not materially different.   See Weinreich v. Los Angeles County Metropolitan Transp. Authority, 114 F.3d 976, 978, n.3 (9th Cir. 1997).

16

1 | reason he was dismissed from medical school.

2 | The inquiry as to whether Mr. Wong is actually disabled under
3 | 42 U.S.C. § 12102(A) involves three discreet steps. First, the
4 | court must decide whether plaintiff suffers from a "physical or
5 | mental" impairment; second, the court must determine whether the
6 | life activity on which plaintiff relies amounts to a "major" life
7 | activity; and third, the court must ask whether the specified
8 | impairment "substantially limits" that major life activity.
9 | Bragdon v. Abbott, 524 U.S. 624 (1998).

10 | The statute does not define "physical or mental impairment,"
11 | "substantially limits," or "major life activities." Moreover, as
12 | noted, no agency has been delegated authority to interpret the term
13 | "disability." See Sutton, 119 S. Ct. at 2139. Nonetheless, the
14 | agencies have addressed these issues. See 29 C.F.R. § 1630, App.
15 | (EEOC interpretive guidelines, Title I - Employment); 28 C.F.R.
16 | § 35, App. A. (DOJ interpretive guidelines, Title II - State/Local
17 | Government Services.); 28 C.F.R. § 36, App. B. (DOJ interpretive
18 | guidelines, Title III - Accommodation in Commercial Facilities).
19 | As will be noted below, the approach taken by the agencies, while
20 | generally consistent, contain differences which may, in a given
21 | case, be significant.

22 | **i. Substantial Limitation of a Major Life Activity**

23 | The agencies have provided a representative list of "major
24 | life activities," including "functions such as caring for one's
25 | self, performing manual tasks, walking, seeing, hearing, speaking,
26 | breathing, learning, and working." See 28 C.F.R. § 35, App. A.

1 | The list is illustrative, not exhaustive. See Bragdon v. Abbott,
2 | 524 U.S. at 639.   Plaintiff alleges that he is substantially
3 | limited in the major life activities of learning, reading and
4 | working.

5 | Both learning and working are listed as major life activities
6 | by the relevant regulations and interpretive guidelines,[6] and
7 | various courts have concluded that "reading" is a major life
8 | activity. See Bartlett v. New York State Board of Law Examiners,
9 | 2000 WL 1228857 (2d Cir. 2000)(undisputed that reading was a major
10 | life activity); Gonzalez v. National Board of Medical Examiners,
11 | 2000 WL 1179798 (6th Cir. 2000)(no evidence to support that
12 | Gonzalez does not have a reading disability for purposes of the
13 | ADA). The courts' conclusion seems quite appropriate given that
14 | "physical and mental impairment" includes "specific learning
15 | disabilities" See 28 C.F.R. § 35, App. A, and that reading is
16 | integral to an individual's success in today's work environment.
17 | Even assuming the general validity of the guidelines examples,
18 | however, their direct application to the instant case is not clear.

19 | While plaintiff was found in various tests to have a learning
20 | disability, it was generally characterized as difficulty in
21 | assimilating verbal or written information under pressure. Indeed
22 | in his deposition, plaintiff admits that his impaired reading in
23 | no way adversely effects his day to day ability to read. He admits

24 |

25 | ⁶ The Sutton court noted a circularity of reasoning attendant
26 | upon the listing of work as a major life activity.   See n. 11
supra.

18

to reading for pleasure in a wide range of technical and
nontechnical books and periodicals.  He has no difficulty in the
reading necessary to conduct the ordinary tasks in life, like
comprehending street signs, going to the grocery, or renewing his
driver's license.  Indeed, he has admitted that he has never been
required to ask for aid because he could not understand something
he read, and never has concluded that he could not do a particular
job, or acquire a particular skill because of his difficulty in
reading.

It is one thing to speak of an impaired ability to read and
comprehend generally, for clearly those are major life activities.
It appears to this court, however, that the ability to read under
pressure presents quite a different issue.  Although plaintiff has
confounded the two, he fails to make a case for the latter being
a major life activity, and I conclude that it is not.  Plaintiff's
claims as to a substantial disability fairs no better.

To establish a prima facie case of disability discrimination
under the ADA, plaintiff must prove that his impairment is a
substantial limitation on a major life activity, not one which
amounts to a mere difference. See Alberton's Inc. v. Kirkingburg,
119  S.  Ct.  2162,  2168  (1999)("[w]hile  the  [ADA]  addresses
substantial  limitations  on  major  life  activities,  not  utter
inabilities, it concerns itself only with limitations that are in
fact substantial").  Put another way, whether or not plaintiff has
a  "learning  disability"  is  not  determinative,  but  rather  the
analysis is dependent on how "substantial" the impairment is,

1 coupled with the effect on his life, given his relevant personal
2 characteristics. See C.F.R. § 1630, App. § 1630.2(j); Mondezelewski
3 v. Pathmark Stores, Inc., 162 F.3d 778, 783 (3d Cir. 1998)
4 (necessary to assess employee's back condition coupled with his
5 personal characteristics to determine if he was substantially
6 limited in his ability to work); McKay v. Toyota Motor Mfg. U.S.A.,
7 Inc., 110 F.3d 369 (6th Cir. 1997)(plaintiff with carpal tunnel
8 syndrome not disabled because, among other things, she had a
9 college degree); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 724
10 (2d Cir. 1994)(plaintiff not hindered in her ability to work
11 because of her advanced degrees).

12     In terms of how to measure substantial impairment the agencies
13 have adopted disparate standards.  The EEOC requires a comparison
14 with the ability of the average person's performance.[7]  The

16     [7] 29 C.F.R. § 1630.2 provides that:

17       (1) The term substantially limits means:
    (i) Unable to perform a major life activity that the
18 average person in the general population can perform;
or
19 (ii) Significantly restricted as to the condition,
manner or duration under which an individual can perform
20 a particular major life activity as compared to the
condition, manner, or duration under which the average
21 person in the general population can perform that same
major life activity.
22     (2) The following factors should be considered in
determining whether an individual is substantially
23 limited in a major life activity:
(i) The nature and severity of the impairment;
24 (ii) The duration or expected duration of the
impairment; and
25 (iii) The permanent or long term impact, or the expected
permanent or long term impact of or resulting from the
26 impairment.

20

1 Department of Justice, however, requires the comparison to be made
2 "to most people." See 28 C.F.R. § 35, App. A.[8] It seems clear that
3 while application of the two standards will frequently yield the
4 same result, there may be activities where the mean and the
5 majority do not coincide.

6 How to resolve the inter-agency conflict presents a difficult
7 conundrum. Of course, the court should choose the interpretation
8 most closely adopted to Congress' purpose. That test, however,
9 yields no particular result, each seems a perfectly plausible
10 interpretation. Perhaps, given that we deal with a public entity,
11 the DOJ's interpretation should be preferred since it was given
12 general powers in regard to Title II. Nonetheless, as Sutton
13 notes, no agency was given any authority over the definition of
14 disability, thus undermining a justification based on Congressional
15 preference.

16 The court must confess that it would be at a loss as to how
17 to choose, if choice were required. As I now explain, however,
18 choice is not required, because whether measured by most people,
19 or the average person, plaintiff is not substantially limited in
20 the major life activities of learning. After examining that
21 question, I consider his impairment in regard to the major life
22 activity of working.

23

24    [8] "A person is considered an individual with a disability for
25 purposes of Test A, the first prong of the definition, when the
individual's important life activities are restricted as to the
26 conditions, manner, or duration under which they can be performed
in comparison to most people." See 28 C.F.R. § 35, App. A

21

1    **ii.  Learning and Reading**

2        Plaintiff points to his own history of reading and learning
3    problems to demonstrate that he has raised a triable issue of
4    material fact as to whether he is substantially limited in his
5    ability to read and learn.  His declaration avers that he was
6    diagnosed in elementary school as having "speech and language
7    difficulties," that he required additional time to complete written
8    exams in high school, that he requested extra time on assignments
9    and tests in junior college and at San Francisco State University,
10   and, he took speech and communications courses at San Mateo
11   Community College.  Moreover, he points to the conclusion of
12   various experts, noted above, who diagnosed him with a learning
13   impairment.

14       It is true that the clinical evaluations conclude that Mr.
15   Wong has a "learning disability" with respect to his ability to
16   read under time constraints and verbally process and comprehend
17   information. Assuming the legitimacy of the clinical conclusions,
18   as I must for summary judgment purposes, they are not
19   determinative.[9]  Conceding a learning impairment, the issue is
20   whether the plaintiff is disabled within the meaning of the Act.
21   For that purpose a baseline for comparison must be established.

22

23       [9]  I note, however, that plaintiff never claims to have
     actually received accommodations for his requests to have more time
     on assignments and exams during his college or post-graduate
24   studies.  Moreover, plaintiff fails to demonstrate a causal nexus
     between enrolling in a speech and interpersonal communications
25   course and a purported substantial limitation with respect to
     reading and learning.  These various facts, however, are simply
26   grist for the jury, if there is a triable issue of fact.

1 As noted above, under the regulations the baseline is either most
2 people or the average person. When compared to either baseline,
3 plaintiff's claim must fail.

4     Mr. Wong has demonstrated his academic prowess throughout his
5 life, and the fact that the third and fourth years of medical
6 school proved more difficult for plaintiff hardly demonstrates a
7 substantial limitation on his ability to learn and read as compared
8 with most people or the average person. Plaintiff bears the burden
9 of proof as to disability. Given his previous academic success the
10 issue translates to whether he can demonstrate that most people,
11 or the average person, would not have difficulty with the third and
12 fourth years of medical school. For summary judgment purposes he
13 must demonstrate that a question of fact exists as to that
14 question. The court can take judicial notice of the highly
15 selective criteria employed in determining admission to medical
16 school to belie such a conclusion. In sum, Mr. Wong's limitations,
17 whatever they may be, do not appear to be sufficiently severe as
18 measured by the established baselines to conclude that he is
19 disabled within the meaning of the Act.

20     The above conclusion is buttressed by the Supreme Court's
21 teaching concerning the scope of the intended beneficiaries of the
22 Act. The Court has explained, relying, inter alia, on 42 U.S.C.
23 § 12101(a)(7), that the purpose of the ADA is to protect
24 individuals with disabilities that are "a discrete and insular
25 minority," persons "subjected to a history of purposeful unequal
26 treatment, and relegated to a position of political powerlessness

1  in our society." <u>Sutton</u>, 119 S. Ct. at 2152 (Ginsburg, J.,
2  concurring). The <u>Sutton</u> court concluded that the Act was designed
3  to restrict its protection to a confined, and historically
4  disadvantaged, class. <u>Id.</u> Finding that a learning disability
5  which has not prevented the plaintiff from attaining superior
6  grades, a Masters Degree, and completing two years of medical
7  school is, nonetheless, a substantial limitation on the life
8  activity of learning or reading, and thus a disability under the
9  Act, is inconsistent with <u>Sutton</u>'s explanation of those the
10 Congress intended as beneficiaries.

11     I conclude that the record, taken as a whole, could not lead
12 a rational trier of fact to find that plaintiff is substantially
13 limited in the major life activities of learning and reading.  <u>See</u>
14 <u>Price v. National Board of Medical Examiners</u>, 966 F. Supp. 419
15 (S.D.W.Va. 1997)(finding that plaintiffs were not disabled under
16 the ADA because they were able to learn as well or better than the
17 average person in the general population ). Defendant's motion for
18 summary judgment will be granted as to the major life activities
19 of learning and reading.[10]

20

21     [10]  At oral argument, plaintiff contended that his situation
   is analogous to the crippled climber of El Capitan, i.e. despite
22 his success, no one could doubt that the climber was disabled.
   While seductive, the analogy is false. Under the regulations, the
23 definition of impairment requires a comparison with most people or
   the average person.  Thus, if most people could not climb El
24 Capitan, the climber would not be disabled for that purpose, even
   if he is for many other purposes.  Put simply, the standard for
25 disability in the instant case tests plaintiff's claims against a
   baseline which indicates that his general academic success
26 precludes a finding of disability for the claimed activity.

1  ### iii.  **Working**

2  I now turn to whether Mr. Wong is substantially limited in his

3  ability to work.[11]  Here, once again, the interpretive guidelines

4  issued by the relevant agencies differ as to what standard to apply

5  to work when considered as a major life activity.  While the DOJ

6  guidelines suggest that it is appropriate to compare the plaintiff

7  to most people, the EEOC's regulations recommend that an individual

8  be compared to the "average person having comparable training,

9  skills, and abilities," in determining whether plaintiff was

10  substantially limited in his ability to work.  See 29 C.F.R.

11  § 1630.2(j)(3)(i).[12]  Moreover, the term substantially limits is

12

---

13  [11]  Defendant does not challenge that working is a "major life
activity."  However, the Sutton court, in dicta, notes that there
14  may be some conceptual difficulty in defining "major life
activities" to include work, for it seems "to argue in a circle to
15  say that if one is excluded, for instance, by reason of [an
impairment, from working with others] . . . then that exclusion
16  constitutes an impairment, when the question your asking is,
whether the exclusion is by reason of handicap. See Sutton, 119 S.
17  Ct. at 2139.  The EEOC itself has expressed reluctance to define
"major life activities" to include working and has suggested that
18  working be viewed as a residual life activity, considered, as a
last resort, only "[i]f an individual is not substantially limited
19  with respect to any other major life activity." See id.; 29 C.F.R.
§ 1630, App § 1630.2(j) (1998)("If an individual is substantially
20  limited in any other major life activity, no determination should
be made as to whether the individual is substantially limited in
21  working.")

22  [12]  At first glance the guideline appears to make no sense.
If the plaintiff is to be compared with persons having the same
23  skills and abilities, it would appear to require that the plaintiff
be compared with persons with the same physical or mental
24  characteristics relied on to demonstrate a disability.  Under such
circumstances, no one would ever be disabled.  The court thus
25  concludes that the references to skills and abilities pertains to
job skills and abilities, not to physical or mental
26  characteristics.

25

1  defined as "significant restrict[ion] in [an individual's] ability
2  to perform either a class of jobs or a broad range of jobs in
3  various classes," see id. i.e., the inability to perform a
4  particular job does not constitute a substantial limitation on a
5  major life activity of working.[13]

6     Once again the instant motion does not require the court to
7  decide which standard governs.  Plaintiff's admissible evidence
8  fails to demonstrate that there is a triable issue of material fact
9  that Mr. Wong is substantially limited in his ability to work under
10 either standard.  I turn to plaintiff's showing relative to the
11 more liberal EEOC standard to illustrate this point.

12     As noted, Mr. Wong has tendered evidence that he suffers a
13 number of impairments, including a slow reading rate under timed
14 conditions, a poor ability to organize, analyze and reduce or
15 synthesize information quickly in pressured environments, and an
16 awkward personal style of interacting with others.  Given his
17 academic achievements, however, and his intellectual skills, Mr.
18 Wong has an enormous range of professional positions and

19

20     [13]   When analyzing whether there has been a substantial
   limitation on the major life activity of working, the EEOC
21 regulations provide that the courts may also consider: (1) the
   geographical area to which the individual has reasonable access;
22 (2) the job from which the individual has been disqualified, and
   the number and types of jobs utilizing similar training, knowledge,
23 skills or abilities from which the individual is also disqualified
   ("class of jobs"); and/or (3) the job from which the individual has
24 been disqualified, and the number and types of other jobs not
   utilizing similar training, knowledge, skills or abilities from
25 which the individual is also disqualified ("broad range of jobs").
   See  29 C.F.R. § 1630.2(j)(3)(ii); Mondezelewski v. Pathmark
26 Stores, Inc., 162 F.3d 778, 783 (3d Cir. 1998).

1 occupations in which it is apparent that he could engage in
2 successfully.

3    Plaintiff will only be precluded from jobs that require very
4 specific and detailed deductive reasoning in an information-
5 intense, rapid-flux, time-pressured or stressful environment.
6 Thus, Mr. Wong may be unable to work in an emergency room setting,
7 or may even be foreclosed from his desire to practice geriatric
8 psychiatry.   The Supreme Court has taught, however, that when
9 applying the EEOC regulations, a person "must be precluded from
10 more than one type of job, a  specialized job, or a particular job
11 of choice." See Sutton, 119 S. Ct. at 2151.   Under the
12 circumstances, defendant's motion for summary judgment will be
13 granted as to this issue.

14        **iv.   "Regarded As" Being Disabled**

15    I must also determine whether Mr. Wong is disabled under 42
16 U.S.C. § 12102(C).  To be regarded as disabled, defendant must have
17 perceived Mr. Wong as having an actual disability under the ADA.
18 See Deppe v. United Airlines, 217 F.3d 1262, 1265 (9th Cir. 2000).
19 That is, the perceived disability must have been regarded as being
20 a "substantial limitation."   See Thompson v. Holy Family Hosp.,
21 121 F.3d 537, 540 (9th Cir. 1997).

22    A person is regarded as having a substantially limiting
23 impairment if the individual has a physical or mental impairment
24 that does not substantially limit major life activities but that
25 is treated by a recipient as constituting such a limitation, has
26 a physical or mental impairment that substantially limits major

27

1  life activities only as a result of the attitudes of others toward
2  such impairment, or has none of the impairments defined in the
3  regulations but is treated by a recipient as having such an
4  impairment.  See 28 C.F.R. § 35, App. A; 29 C.F.R. § 1630, App.[14]

5       In the matter at issue, to avoid summary judgment, plaintiff
6  must show that at the time he was dismissed from medical school
7  there was at least a question whether defendant regarded him as
8  having a physical or mental impairment that substantially limited
9  his ability to read, learn, or work.  The defendant must have
10 "entertain[ed] misperceptions" about Mr. Wong--it must have
11 believed either that Mr. Wong had "a substantially limiting
12 impairment that [he did] not have" or that he had a "substantially
13 limiting impairment, when, in fact, the impairment [was] not so
14 limiting."  See Sutton, 119 S. Ct. at 2149.

15      As noted above, various experts associated with the University
16 had concluded that the plaintiff either suffered from a number of
17 impairments, or at least had a history of such impairments.
18 Moreover, in light of those conclusions, plaintiff was provided
19 various accommodations, including being allowed to take off two
20 months before the commencement of his Surgery Clerkship and his
21 Medicine Clerkship, and was allotted additional time to take both
22 written and oral examinations in his third and fourth years of
23 medical school.

24

25      [14]  The DOJ and EEOC interpretive guidelines that define
   "regarded as" are substantially similar, and, accordingly, I defer
26 to them.

28

1    Defendant contends that Mr. Wong was not dismissed from the
2  medical school because the faculty and deans thought he was
3  substantially limited in a major life activity, but because Mr.
4  Wong's academic record convinced them that he was not likely to
5  become a competent physician.  Whether that is true is for the
6  trier of fact to decide.  While, certainly, there is sufficient
7  evidence to support the University's contention, I must conclude
8  that plaintiff has provided evidence from which a rational trier
9  of fact could conclude that the doctors, faculty, and members of
10  the administration at U.C. Davis "entertained misperceptions"[15]
11  about Mr. Wong and believed that he had a "substantially limiting
12  impairment, when, in fact, the impairment [was] not so limiting."
13  See Sutton, 119 S. Ct. at 2149.  Accordingly, a genuine issue of
14  material fact remains as to whether defendant regarded Mr. Wong as
15  substantially limited in a major life activity.

16    For the foregoing reasons, the court hereby makes the
17  following ORDERS:

18    1.   Defendant's motion for summary judgment is GRANTED as to
19  plaintiff's claim that he is substantially limited the major life
20  activities of learning, reading and working under 42 U.S.C.
21  § 12102(A); and

22  ////

23

24       [15]  An individual satisfies the third part of the "regarded
25  as" definition of "disability" if the covered entity erroneously
     believes the individual has a substantially limiting impairment
26  that the individual actually does not have.  See 29 C.F.R. § 1640,
     App.

29

2.   Defendant's motion for summary judgment is DENIED as to plaintiff's claims that he was "regarded as" disabled under 42 U.S.C. § 12102(C).

IT IS SO ORDERED.

DATED:   January 9, 2001.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

United States District Court
for the
Eastern District of California
January 11, 2001

\* \* CERTIFICATE OF SERVICE \* \*

2:96-cv-00965

Wong

   v.

Regents of the Univ

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  January 11, 2001, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

Dan Siegel           SJ/LKK
Siegel Yee and Jonas
499 14th Street
Suite 220
Oakland, CA  94612

Michael T Lucey
Gordon and Rees
Embarcadero Center West
275 Battery Street
Suite 2000
San Francisco, CA  94111

Jack L. Wagner, Clerk

BY: _____
Deputy Clerk